## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MARTIN GALATON, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>WILLIAM D. JOHNSON, JOHN H. MULLIN III, E. MARIE MCKEE, CARLOS A. SALADRIGAS, JAMES E. BOSTIC JR., THERESA M. STONE, W. STEVEN JONES, ALFRED C. TOLLISON JR., HARRIS E. DELOACH JR., CHARLES W. PRYOR JR., ROBERT W. JONES, JAMES B. HYLER JR., JOHN D. BAKER II, MELQUIADES R. MARTINEZ, DUKE ENERGY CORP., DIAMOND ACQUISITION AND CORP., AND PROGRESS ENERGY CORP.<br><br>          Defendants | **CLASS ACTION COMPLAINT**<br><br>**CASE No.** |

Plaintiff Martin Galaton ("Plaintiff"), by his attorneys, alleges the following against Defendants upon information and belief, except for his own acts, which are alleged on knowledge, based upon, among other things, a continuing investigation conducted by and through his undersigned counsel into the facts and circumstances alleged herein, including, without limitation, review and analyses of: (i) the public filings of Progress Energy, Inc. ("Progress" or the "Company") and Duke Energy Corporation and Diamond Acquisition Corporation (collectively, "Duke Energy") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, public statements, news articles, and other publications disseminated by or concerning Progress and related entities and the Proposed Transaction (defined below); and (iii) Defendants' corporate websites:

## I.  NATURE OF THE ACTION

1.     Plaintiff brings this class action on behalf of the public stockholders of Progress against Progress' Board of Directors (the "Board" or the "Individual Defendants") seeking equitable and other relief for the Board's breaches of its fiduciary duties arising out of its attempt to sell the Company to Duke for an unfair price and pursuant to a flawed process, and against Progress, the Board and Duke for making material misstatements in, and omitting material facts from the joint Duke/Progress S-4 Registration Statement/Prospectus/Preliminary Proxy originally filed with the SEC on March 17, 2011, and amended for the fifth time on July 7, 2011 ("Registration Statement"), in violation of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act").  A shareholder vote has been scheduled for August 23, 2011, and Plaintiff seeks injunctive relief prior to the shareholder vote because shareholders are now set to vote without all material information and are thereby going to suffer irreparable harm by being forced to vote without all material information.  Plaintiff seeks immediate injunctive relief in this action, requiring Progress to correct its Registration Statement prior to any shareholder vote.  This action also asserts claims against Duke and Progress for aiding and abetting the Board's breaches of their fiduciary duties and against Duke and Progress for aiding and abetting violations of the federal securities laws.

2.     On January 10, 2011, Progress and Duke announced a definitive agreement, pursuant to which Duke will acquire all of the outstanding shares of Progress in an all-stock transaction whereby Progress stockholders will receive 2.6125 shares of Duke's common stock in exchange for each share of Progress common stock (the "Proposed Transaction").  Based on Duke's closing share price on January 7, 2011, the day before Defendants signed the January 8,

2011 merger agreement with Duke (the "Merger Agreement"), Progress shareholders' would receive a value of $46.48 per share for the Company.

3.     The Proposed Transaction was approved by a heavily conflicted and majority interested Board, half of which stand to receive post-closing employment with the combined company and other lucrative financial benefits that are not being equally shared by the Company's stockholders.     Specifically, defendant William D. Johnson ("Johnson"), the Company's President, CEO and Chairman of the Board, is slated to become CEO of the new Duke. In addition, seven of the Company's fourteen Board members, including Johnson, will become board members of the combined company and four members of Johnson's conflicted management team will continue employment with the new company. Johnson also stands to receive up to $22 million upon consummation of the Proposed Transaction in change of control benefits.

4.     The Board entered into the Proposed Transaction at a time when the Company was reporting consecutive quarters of strong financial results and growth.     Touting the Company's strong 2010 financial results, Johnson stated: "[w]e delivered strong financial results, while making the investments necessary to meet customer needs now and in the future." Further, in a recent March 2011 press release, the Company reported that Progress had "achieved ongoing earnings per share in its original targeted range or higher for the fifth consecutive year in 2010, while maintaining its long record of commitment to the dividend."

5.     Despite the Company's strong performance, the Board entered into the Proposed Transaction, admittedly without making any attempt whatsoever to shop the Company or solicit even one other bid to adequately inform itself of whether the price being offered by Duke was the best price reasonably attainable for the Company's shareholders.  Instead, the supine Board

allowed defendant Johnson to quietly rush through a deal with Duke, his obviously preferred bidder, while maintaining the appearance to the market that the Company was not for sale.

6.     Johnson's discussions with Duke focused largely on his future employment with the combined company, rather than obtaining the best price for shareholders. In order to secure his CEO position and "change of control" benefits, Johnson quickly and unreasonably excluded the only potential parties that expressed an interest in a strategic transaction with Progress – Company's A, B and C -- in favor of Duke.   In July 2010, the Board (at Johnson's recommendation) inexplicably terminated discussions with Company A, less than one month after receiving an offer from Company A for an undisclosed premium, in favor of Duke and before any terms or potential benefits of a merger with Duke were even discussed. The Board also refused to engage in any meaningful discussions with Company B.   Moreover, since Johnson hid the fact that Progress was for sale, Company C was unaware of the opportunity to submit a competing bid for Progress until news about the merger leaked out in early January 2011. Company C moved quickly to inform the Board of its interest in acquiring Progress, but was rejected outright. The Board breached its fiduciary duties by failing to give any meaningful consideration to the offers and overtures from these other bidders or use their interest to create a competitive bidding process or even conduct any kind of pre or post merger "market check".

7.     Further, the proposed consideration is grossly inadequate and does not fully take into account the Company's strong performance and prospects for continued growth. In breach of its fiduciary duties, the Board agreed to sell the Company for the equivalent of $46.48 per share, which represents a tiny premium of only 3.9% and is well below the average premium of 17% paid for U.S. electric utilities during the last two years. The day before the Board signed the Merger Agreement, Progress rejected an offer from Company A, which stated it was willing

to pay as much as a 15% premium to acquire Progress – nearly four times the price Duke agreed to pay for the Company in the Proposed Transaction. Moreover, Wall Street analysts, including JP Morgan, issued a price target for Progress of $47.00 per share before the Proposed Transaction was announced, representing a significant premium over Duke's offer price.

8.      Analysts commenting on the deal have heavily criticized the small premium the Company's shareholders are to receive if the deal goes though. For example, David Grumhaus, a partner and utilities expert at the Chicago hedge fund Copia Capital told Bloomberg News commented: "I don't like this deal at all if I'm Progress. It's hard to see how they couldn't have held out for a bigger premium." A January 9, 2011 *Wall Street Journal* article similarly reported that "Duke is paying a low premium to Progress' shares" and the supposed benefits from the deal "are hazy." Thus, the consideration Progress shareholders are to receive is inadequate. Progress shareholders now stand to control only approximately 37% of the combined company, giving up their control for a meager 3-5% premium.

9.      Defendants then exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a competing offer for the Company. Specifically, pursuant to the Merger Agreement, Defendants agreed to the following: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirors or even continuing discussions and negotiations with potential acquirors; (ii) a provision that provides Duke with five business days to match any competing proposal in the event one is made; (iii) a termination fee of $400 million; and (iv) a provision that requires that the Board submit the Proposed Transaction to the Company's shareholders for approval even if the Board later believes that the Proposed Transaction would breach its fiduciary duties. These provisions substantially and improperly

limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Progress.

10.     Defendants violated Section 14(a) of the Exchange Act and breached their fiduciary duties by issuing misleading statements and omitting material information in connection with the Registration Statement. Specifically, the Registration Statement fails to provide the Company's shareholders with material information and provides them with materially misleading information concerning, *inter alia*, the defective sales process, the financial analyses performed by Progress' and Duke's financial advisors and the conflicts of the bankers providing fairness opinions in connection with the Proposed Transaction. Without full and accurate disclosures, Progress' shareholders will be unable to make an informed vote.

11.     As illustrated above, and alleged in more detail herein, the Board breached its fiduciary duties by, *inter alia*, failing to maximize shareholder value in connection with the Proposed Transaction and by failing to disclose all material information concerning the Proposed Transaction. Without imminent court intervention, Plaintiff and the Class will suffer irreparable harm if they must decide whether to vote for the merger without all material information concerning the Proposed Transaction. Accordingly, this action seeks relief in equity and law, and seeks to enjoin the Proposed Transaction and require Defendants to disseminate an accurate and complete Registration Statement that fully and fairly informs shareholders of all material information concerning the Proposed Transaction in a non-misleading manner.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act for violations of Sections 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9. This court also has pendent jurisdiction over state law claims pursuant to 28 U.S.C. §1367.

13. Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

14. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

III. **PARTIES**

15. Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Progress.

16. Defendant Progress, a corporation organized and existing under the laws of the State of North Carolina, maintains its principal corporate offices at 410 S. Wilmington Street, Raleigh, North Carolina 27601. Progress is a Fortune 500 energy company with approximately 22,000 megawatts of generation capacity and approximately $10 billion in annual revenues. The Company's business includes two major electric utilities that serve approximately 3.1 million customers in North Carolina, South Carolina and Florida.

17. Defendant Duke, a Delaware corporation headquartered in North Carolina, is one of the largest electric power holding companies in the United States. Its regulated utility operations serve approximately 4 million customers located in five states in the Southeast and Midwest, representing a population of approximately 11 million people.

18. Defendant Diamond Acquisition Corporation is a North Carolina corporation wholly-owned by Duke that was created for the purposes of effectuating the Proposed Transaction.

19. Defendant William D. Johnson, a citizen of North Carolina, has been the President, Chief Executive Officer, and Chairman of the Board of the Company since 2007. Johnson served as President and Chief Operating Officer of Progress, from January 2005 to

October 2007, and has been with the Company since 1992. If the Proposed Transaction is consummated, Johnson will become the CEO and a board member of the combined company.

20.    Defendant John H. Mullin III ("Mullin") has been a director of the Company since 2007 and is a citizen of Virginia. Mullin is "Lead Director" of the Board and serves as Chairman of the Corporate Governance Committee and as a member of the Finance and Organization and Compensation Committees.

21.    Defendant E. Marie McKee ("McKee") has been a director of the Company since 1999 and is a citizen of New York. McKee serves as Chairperson of the Organization and Compensation Committee and as a member of the Corporate Governance and Operations and Nuclear Oversight Committees. If the Proposed Transaction is consummated, McKee will serve as a board member of the combined company.

22.    Defendant Carlos A. Saladrigas ("Saladrigas") has been a director of the Company since 2001 and is a citizen of Florida. Saladrigas serves as a member of the Audit and Corporate Performance and Finance Committees. If the Proposed Transaction is consummated, Saladrigas will serve as a board member of the combined company

23.    Defendant James E. Bostic, Jr. ("Bostic") has been a director of the Company since 2002 and is a citizen of Georgia. Bostic sits on the Audit and Corporate Performance, Operations and Nuclear Oversight Committees.

24.    Defendant W. Steven Jones ("W. Jones") has been a director of the Company since 2005 and is a citizen of North Carolina. W. Jones sits on the Audit and Corporate Performance, Operations and Nuclear Oversight Committees.

25.     Defendant Alfred C. Tollison Jr. ("Tollison") has been a director of the Company since 2006 and is a citizen of Georgia. Tollison sits on the Audit and Corporate Performance, Operations and Nuclear Oversight Committees.

26.     Defendant Harris E. DeLoach Jr. ("DeLoach") has been a director of the Company since 2006 and is a citizen of South Carolina. DeLoach serves as Chairman of the Nuclear Oversight Committee and as a member of the Organization and Compensation Committee. If the Proposed Transaction is consummated, DeLoach will continue as a member of the new board.

27.     Defendant Charles W. Pryor Jr. ("Pryor") has been a director of the Company since 2007 and is a citizen of Virginia. Pryor sits on the Audit and Corporate Performance, Operations and Nuclear Oversight Committees.

28.     Defendant Robert W. Jones ("R. Jones") has been a director of the Company since 2007 and is a citizen of New York. R. Jones serves as Chairman of the Finance Committee and as a member of the Corporate Governance and Organization and Compensation Committees.

29.     Defendant James B. Hyler Jr. ("Hyler") has been a director of the Company since 2008 and is a citizen of North Carolina. Hyler is a member of the Finance and Organization and Compensation Committees. If the Proposed Transaction is consummated, Hyler will continue as a member of the new board.

30.     Defendant John D. Baker II ("Baker") has been a director of the Company since 2009 and is a citizen of Florida. Baker sits on the Finance and Organization and Compensation Committees. If the Proposed Transaction is consummated, Baker will continue as a member of the new board.

31.     Defendant Melquiades R. Martinez ("Martinez") has been a director of the Company since 2010 and is a citizen of Florida.  Martinez sits on the Operations and Nuclear Oversight and Organization and Compensation Committees.

32.     Defendant Theresa M. Stone ("Stone") has been a director of the Company since 2005 and is a citizen of Massachusetts.  Stone serves as Chairperson of the Audit and Corporate Performance Committee and as a member of the Corporate Governance and Finance Committees.  If the Proposed Transaction is consummated, Stone will continue as a member of the new board.

33.     Defendants referenced in ¶¶ 19 through 32 are collectively referred to herein as the Individual Defendants and/or the Board.

## IV.     THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

34.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, they owe Plaintiff and the Class the highest duty of care, loyalty, good faith, candor, and independence.  Each of the Individual Defendants is required to act in good faith, in the best interests of the Company and its stockholders, and with the degree of care that would be expected of an ordinarily prudent person.

35.     Where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a breakup of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest price reasonably available for the Company, rather than use a change of control to their own benefit, and to disclose all material information concerning the proposed change of control so as to enable shareholders to make an informed voting decision. To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)      adversely affects the value obtained for the Company's shareholders;

(b)      favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)      adversely affects their duty to search and secure the best value for the Company's shareholders reasonably available under the circumstances; and/or

(d)      will provide the Individual Defendants with preferential treatment at the expense of Progress' shareholders.

36.      In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)      participating in any transaction where the Individual Defendants' loyalties are divided; and/or

(b)      unjustly enriching themselves at the expense or to the detriment of the Company.

37.      Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly breaching their fiduciary duties, including their duties of care, loyalty good faith and candor owed to Plaintiff and Progress shareholders.

## V.    FURTHER SUBSTANTIVE ALLEGATIONS

### A.    Progress' Strong Financial Performance And Growth Prospects

38.      Progress is a Fortune 500 energy company with approximately 22,000 megawatts of generation capacity and $10 billion in annual revenues. The Company is comprised of two major electric utilities that serve approximately 3.1 million customers in North Carolina, South Carolina and Florida.

11

39.     Progress has been consistently reporting strong financial and operational results. For example, on February 18, 2011, Progress reported full year GAAP earnings and earnings per share of $856 million and $2.95 per share, respectively, as compared to $757 million and $2.71 per share, respectively, for 2009. The Company also reported 2010 ongoing earnings of $889 million, or $3.06 per share, compared to $846 million, or $3.03 per share in 2009. Progress also recently announced 2011 ongoing earnings guidance of $3.00 to $3.20 per share and significant expected growth.

40.     Recognizing the Company's strong annual 2010 results, Defendant Johnson stated in the February 18 release: "Our continued financial discipline, coupled with very favorable weather, allowed us to achieve our financial goals and meet our commitment to customers and shareholders in 2010. We delivered strong financial results, while making the investments necessary to meet customer needs now and in the future."

41.     On October 29, 2010, Progress reported earnings and earnings per share for the third-quarter of 2010 of $361 million and $1.23 per share, respectively, as compared to $247 million and $.88 per share, respectively, for the third quarter of 2009. The Company's earnings per share for the first nine months of 2010 increased from $2.16 per share in 2009 to $2.53 per share in 2010.

42.     In the October 29 press release announcing the Company's third quarter 2010 financial results, Defendant Johnson touted the Company's strong quarter stating:

> We achieved strong financial performance for our shareholders so far this year and successfully met high energy demand during one of the hottest summers on record. The economy in the Carolinas and Florida continues to show modest but steady signs of recovery, and we remain focused on managing costs and improving operations and execution. The third quarter was particularly strong in terms of weather, and higher revenues enabled us to increase our focus on investments and improvements in our nuclear program

that will position those vital facilities to continue meeting our customers' energy needs reliably and affordably for decades to come. Due primarily to the continued strength in weather, the company is narrowing its 2010 ongoing earnings range to $3.00 to $3.05 per share, which is the high end of our previously announced guidance.

43.     In addition, for the year-ended December 31, 2009, Progress reported a total return for the year of 10.4%, as compared to an average of 9.66% for its Benchmarking Peer Group.  Progress also increased its dividend payment in 2009 to $693 million, up from $642 million in 2008, representing the Company's twenty-first consecutive increase to its dividend payments.  Defendant Johnson stated in the 2009 Annual Report that he foresaw the Company producing "average annual total shareholder return in the 7% to 10% range over the long term." In a letter attached to the 2009 Annual Report, Defendant Johnson stated that Progress "posted good financial results in a challenging year.   [Progress] delivered a 10% total return to shareholders in 2009 and achieved ongoing earnings per share in our original targeted range for the fourth year in a row.   Our Company also has . . . pa[id] a dividend for more than 250 consecutive quarters."

44.     In an article dated November 15, 2010, an analyst on Zacks.com commented on Progress' bright future stating:

Future prospects appear bright given that it generates the majority of its earnings from stable, regulated electric operations. Furthermore, Progress Energy is pursuing the option of adding new nuclear capacities at both its Carolinas and Florida utilities.

Additionally, Progress Energy is pursuing a balanced strategy for a secure energy future – formulating aggressive energy efficiency programs, investments in renewable energy technologies and a state-of-the-art electricity system.

45.     In addition, defendant Johnson stated in a recent March 2011 news release,:

We are encouraged by the prospects for growth in our customer base and the overall economy. But we continue to keep a sharp focus on excelling in the daily fundamentals and meeting our current responsibilities. Operational focus and financial discipline are essential even as we adapt to a changing industry and prepare for the decades to come.

46. The March 2011 news release further noted that "Progress achieved ongoing earnings per share in its original targeted range or higher for the fifth consecutive year in 2010, while maintaining its long record of commitment to the dividend."

47. As demonstrated herein, Progress has been reporting strong financial results and growth. Thus, there was no immediate need to enter into a sale of the Company to Duke at the grossly inadequate price offered in the Proposed Transaction.

## B.   Progress Announces The Proposed Transaction Agreeing To Sell The Company For An Inadequate Price

48. In a press release dated January 10, 2011, the Company announced that it had entered into the Merger Agreement with Duke pursuant to which Duke will acquire all of the outstanding shares of the Company for 2.6125 shares of common stock of Duke in exchange for each share of Progress common stock. Based on Duke's closing share price on January 7, 2011, the proposed exchange ratio equates to approximately $46.48 per share, or $13.7 billion in total equity value. Duke also will assume approximately $12.2 billion of Progress' net debt.

49. The combined company, which will be named Duke, will be the country's largest utility, with approximately $65 billion in enterprise value and $37 billion in market capitalization. In addition, this giant conglomerate will have the country's largest regulated customer base, providing service to approximately 7.1 million electric customers in six regulated service territories in North Carolina, South Carolina, Florida, Indiana, Kentucky and Ohio.

50.     As discussed below, the heavily-conflicted Progress Board delivered the Company to Duke at an inadequate price, after summarily dismissing other negotiation partners offering significantly higher premiums to shareholders.     No other potential business combinations were sought and no market check was conducted, either before or after the Merger Agreement (though Company A's two offers indicate that Progress shareholders were betrayed). The lead negotiator for Progress, defendant Johnson, focused extensively on board composition, executive positions, and his "change in control" fees. He now stands to be CEO of the largest energy company, which will be the "pride and joy" of North Carolina, while receiving large sums of money as a direct result of the consummation of the Proposed Transaction.

        **1.**       **The Heavily Conflicted Board Failed To Conduct A Sales Process To Reasonably Inform Itself That Progress' Shareholders Are Getting The Best Price, Impermissibly Relied Upon the Advice Of Its Irreconcilably Conflicted Financial Advisors And Failed To Disclose <u>Material Disclosures Relating to the Flawed Negotiation Process</u>**

51.     The conflicted Progress Board breached its fiduciary duties by failing to conduct any semblance of a sales process to gauge interest in the Company from potential acquirers (other than Duke) through a competitive bidding process which would yield the highest price for Progress' shareholders. Instead, the Board allowed defendant Johnson, who negotiated for himself the lucrative and prestigious position of CEO of the combined company before the terms of a deal were even finalized, lead negotiations with Duke. The Board also breached its fiduciary duty of candor and violated Section 14(a) of the Exchange Act by failing to disclose material facts concerning negotiations with Duke, the Board's deliberation process and details concerning Progress' and Duke's financial advisors conflicts of interests -- material facts necessary for shareholders to make an informed vote.

52.     As demonstrated below, Johnson's discussions with Duke throughout 2010 and early 2011 focused largely on his future employment with the combined company, rather than obtaining the best price for shareholders. In order to secure his CEO position, Johnson quickly and unreasonably excluded the only two potential parties that expressed an interest in a strategic transaction with the Company early on, in favor of Duke, his preferred bidder. As early as July 2010, Johnson rebuffed overtures from Company A, despite that Company A had offered to pay a premium for the Company. Johnson also refused to proceed in any meaningful discussions with Company B.     Instead, Johnson attempted to push a deal through with Duke, to the detriment of Progress' shareholders.

53.     Although it is unclear who initiated the discussions, defendant Johnson began discussions concerning a possible sale of the Company in June 2009 when he met with the CEO of Company A, a large utility holding company, to consider a strategic combination of Progress and Company A. In October 2009, Johnson met with the CEO of Company B, another large utility holding company, to discuss a possible combination of Progress and Company B. During mid-April 2010, defendant Johnson met with the CFO's of both Company A and Company B to further explore "a possible business combination transaction involving such company and Progress." (The nature of the discussions with Company A and B must be disclosed because they are material to a shareholder's ability to assess the completeness and credibility of the process).

54.     On May 10, 2010, defendant Johnson met with Company A's CEO, again to discuss a strategic combination. During the meeting, Company A's CEO expressed at this early stage of discussions that Company A was willing to pay an undisclosed premium for Progress. Progress and Company A then signed a confidentially agreement on May 11, 2010 and

Case 5:11-cv-00397-D   Document 1   Filed 07/18/11   Page 16 of 59

exchanged preliminary due diligence information. (The premium that Company A was willing to pay must be disclosed to shareholders in order for them to evaluate the price and process).

55. Progress' CFO, Mr. Mulhern, met with a representative from J.P. Morgan Securities LLC ("J.P. Morgan"), Duke's financial advisor, on June 1, 2010 to discuss "general strategic matters." At the request of Duke's board, J.P. Morgan discussed a potential business combination between Progress and Duke to gauge Progress' interest in a transaction. Without any apparent discussion with the Progress Board, Mr. Mulhern, who negotiated for himself the position of Chief Administrative Officer of the merged company, responded that same day that Progress would, indeed, be interested in pursuing discussions with Duke. The Registration Statement fails to, but should, disclose whether it was J.P. Morgan's idea to pursue Progress as an acquisition target at these meeting and why Duke decided that J.P. Morgan should approach Progress, especially in light of the fact that an undisclosed member of the Progress Board is also employed by J.P. Morgan. Defendants should also disclose whether Duke and J.P. Morgan considered this significant conflict prior to contacting Progress, the identity of the Progress Board member/J.P. Morgan employee, the role he or she played in the overall sales process and in negotiating the Proposed Transaction and whether the Board initiated any process to insulate the potential conflicts of interest inherent in this Board member's participation and if so, what the process entailed.

56. On June 14, 2010, Mr. Mulhern met with the CFO of Company B "to discuss financial aspects of a possible combination of Progress and Company B." During this meeting, the parties concluded a combination of Progress and Company B would not be advantageous. (The reason(s) the parties believed a combination of Progress and Company B was not

"advantageous" is material information directly concerning the credibility of the Board's deliberations and process and, thus, must be disclosed).

57.     Progress' Board held a special meeting on June 22, 2010 to discuss the status of discussions regarding a possible transaction involving the Company. Representatives of Lazard & Freres Co., LLC ("Lazard"), Progress' long-term financial advisor, also participated in the discussions. "At this meeting, members of the board discussed what they viewed as a lack of strategic and operating benefits and the potential regulatory approval difficulties associated with a combination with Company A." (The basis of these purported "regulatory approval difficulties" and the reasons why a transaction with Company A lacked strategic and operating benefits are material facts concerning the process that must be disclosed)

58.     On July 6, 2010, Duke's chairmen, president, and CEO, Mr. Rogers contacted defendant Johnson to express his interest in acquiring Progress. During the call, Rogers and Johnson discussed the "strategic rationale", and other undisclosed "related matters." (The strategic rationale and the "related matters" discussed must also be disclosed).

59.     Progress' Board of Directors held a special meeting on July 14, 2010 to discuss the status of negotiations regarding a potential combination with Company A and Duke. During the meeting, defendant Johnson expressed the view that "a combination with Company A or with Duke could result in increased financial strength and thereby further the goal of new nuclear construction in North and South Carolina." The goal of new nuclear construction in North and South Carolina—as opposed to shareholder value—seems to have animated the discussions. The Board also discussed the view that a transaction with Duke offered more "potential operating efficiencies" and less regulatory issues. (The reasons new nuclear construction was a major priority, the "operating efficiencies" that could be achieved by merging with Duke and the

potential regulatory issues relating to a transaction with Company A are material facts that should be disclosed to Progress' shareholders).

60.     At that meeting July 14 Board meeting, representatives of Lazard reviewed with the board "various financial matters" with respect to potential combinations with Company A and Duke. The Board concluded that, although Progress' standalone plan remained viable and attractive, a strategic combination might better advance its objectives. (Defendants must disclose the "various financial matters" the Board discussed with Lazard and the reason(s) the Board concluded that a strategic combination would better meet the Company's objectives).

61.     Pursuant to what appears to be a superficial and transparent analysis designed to favor Duke, the Board concluded that it should not pursue discussions with Company A and only deal with Duke. The Recommendation Statement offers no explanation for why the Board suddenly refused to deal with Company A without seeking the advice of experts as to the "regulatory issues" vis a vis Company A, particularly when Duke had not made an actual offer to acquire Progress. (Defendants must disclose what informed the Board's decision to drop Company A from the process, including its basis for determining there would be greater "regulatory issues" with Company A, as well as the factors the Board considered in its decision to exclude Company A in favor of Duke when Duke had not even submitted an offer. Such factors are material to a shareholder's ability to evaluate the credibility of the Board's process).

62.     Throughout negotiations with Duke, the Board did not even consider reaching out to other potential bidders, conducting any auction process whatsoever or even continuing negotiations with Company A to create price competition. Instead, the Board allowed defendant Johnson and his conflicted management team to lead discussions with Duke, which focused significantly on securing their own future employment with the combined company, without any

meaningful oversight and merely rubberstamped Johnson's actions and recommendations. As discussed in Section V.E, *infra*, Johnson ultimately secured for himself a CEO position at the new company, as well as lucrative post-merger positions for four members of his senior management team.

63.     On July 18, 2010, defendant Johnson met with Mr. Rogers to discuss a combination with Duke, again focusing on his own lucrative employment position with the combined company. During the July 18 meeting, "Mr. Rogers . . . indicated that he would be receptive to moving into the role of executive chairman of a combined company, and having Mr. Johnson become the chief executive officer." (The background of these discussions regarding executive positions, including prior discussions, and why Mr. Rogers would make this indication "out of the nowhere" must be fully disclosed to shareholders).

64.     The July 18 meeting also focused on the "efficiencies associated with operation of the interconnected North Carolina and South Carolina utilities, as well as regulatory matters." (Again these "efficiencies" and "regulatory matters" and whether the efficiencies were based on geographic location, or more conventional horizontal or vertical synergies must be disclosed to shareholders.

65.     On August 6, 2010, Duke and Progress retained the law firm of Skadden Arps, Meagher & Flom LLO as joint regulatory counsel. Progress, of course, did not even consider retaining regulatory counsel to address issues concerning Company A or B before reaching its hasty conclusions to eliminate these bidders from the process. (Defendants should disclose the reasons Progress hired regulatory counsel to address issues with Duke but not Company A or B).

66.     On August 9, 2010, Progress' Board met telephonically to discuss mainly their own future employment rather than entering into a transaction that is in the best interests of the

20
Case 5:11-cv-00397-D   Document 1   Filed 07/18/11   Page 20 of 59

Company's shareholders. Specifically, during the August 9 meeting, the Board discussed "the corporate governance and organizational structure of combined company," and how *"they viewed having Mr. Johnson as the chief executive officer of the combined company as an important element in ensuring implementation of that strategy."* (emphasis added) (Defendants must disclose the reasons the Board viewed having defendant Johnson as the CEO of the new company was "important," and the extent of any prior discussions as to Johnson's employment)

67.     During the August 9 meeting, the Board engaged the Corporate Governance Committee to oversee negotiations with Duke, comprised of defendants DeLoach, Jones, McKee, Mullin and Stone. Three members of this supposed independent committee -- DeLoach, McKee and Stone -- or more than half of the committee members, are irreconcilably conflicted as they are slated to sit on the board of the combined company. Thus, it is not surprising that during the few times the Corporate Governance Committee actually met, it merely rubberstamped Johnson's actions and did not provide any meaningful oversight. The Board also agreed during the August 9 meeting that defendant Johnson would continue to lead negotiations with Duke and provide the committee with periodic updates, apparently at Johnson's discretion.

68.     On August 10, 2010, Mr. Mulhern, Progress' CFO, met with representatives of Duke, Lazard and J.P. Morgan to discuss the financial projections of the two companies. They jointly agreed to retain Booz & Co. ("Booz") to review "potential efficiencies in connection with a merger between the companies." (the Booz productions must be disclosed to shareholders).

69.     On August 26, 2010, Progress' corporate governance committee met telephonically with representatives of Lazard and Hutton & Williams LLP ("Hutton"), Progress' legal counsel, in attendance. The focus of this meeting, again, was largely on "organizational structure" of the combined company, including executive positions. In addition, the committee

discussed "potential financial and strategic benefits" of a combination with Duke and "organization structure," as well as "financial terms of a transaction and the regulatory approval strategy." (Defendants must disclose the "organization structure" considered, as well as the nature and meaning of the "financial and strategic benefits" discussed at the August 26 meeting).

70.     Defendant Johnson and Mr. Rogers continued discussions concerning a transaction between Progress and Duke over the coming weeks, addressing issues concerning management and Board employment, potential terms of the proposed transaction and business strategy. As discussed herein, material facts concerning these discussions, which are necessary to ensure Progress' shareholders have all facts necessary to make an informed decision have not been, but should be, disclosed.

69.     During a September 15, 2010 telephonic discussion with Johnson, Rogers stated he was interested in moving forward with Progress at an "illustrative exchange ratio in a range of 2.5 to 2.6 shares of Duke for each outstanding Progress stock." This was the first informal offer Duke submitted to Progress during the parties' negotiations. Whether this offer was predicated on previous discussions with defendant Johnson is not disclosed. Given the numerous discussion between Johnson and Rodgers, formal and informal, there is good reason to believe that the offer did not come out of nowhere. The Registration Statement provides the impression that it did, and to the extent it does, it is potentially highly misleading to shareholders.

71.     On September 16 and 17, 2010, Progress' Board held its annual strategic planning meeting, with representatives of Lazard and Hutton in attendance. At this meeting, the Board reviewed "potential strategic alternatives" and a possible "combination with Duke Energy," including "potential advantages" and "efficiencies." At this meeting, Johnson extensively discussed and focused on the downsides of Progress Energy's standalone plan which had

previously been described positively (by Johnson himself publicly). Tellingly, defendant Johnson did not discuss even one potential disadvantage to a merger with Duke. (Defendants must disclose whether there were any meaningful discussions at the meeting regarding the potential upside of the standalone plan or the pursuit of other options. If such discussions occurred, the nature of them must be disclosed; if not, this too must be disclosed and explained.

72.     Discussions at the September 16 and 17, 2010 meeting quickly turned to future employment issues, with Board seats and executive positions again the main focus and shareholders' interests an afterthought at best. During the meeting, the Board observed that, "due to the importance they placed on the combined company's strategic focus on the regulated utility business, their support for a transaction would depend on alignment between the two boards and management teams on that strategy and on a corporate governance and organizational structure that would support that strategic focus." The Board then discussed "corporate governance and organizational structure" issues. (The Registration Statement should disclose the nature of discussions concerning management and organizational issues and why the transaction would depend on an alignment between the two boards and management teams so shareholders can adequately assess the credibility of negotiations and the process, particularly in light of Defendants' clear conflicts).

73.     During the September 16 and 17 meeting, the Progress Board, without any basis whatsoever, again concluded that "the potential combination with Duke Energy continued to be more attractive than possible combination with Company A." (The basis for this summary conclusion must be disclosed, especially in light of the low premium Duke is offering, the lack of a sales process, the focus on continuing employment and board positions, and the undisclosed premium offered by Company A that was rejected after preliminary discussions).

74. On September 20, 2010, Duke's board met to discuss the status of negotiations with Progress, including the "potential retained synergy levels." During the September 20 meeting, Ms. Good, Duke's CFO, provided a financial overview of the effect of a combined Duke and Progress "assuming a range of potential merger ratios" and a "range of potential retained synergy levels." (The discussed "range of potential merger ratios and "potential retained synergy levels" must be disclosed to shareholders in order for them to assess the proposed consideration and credibility of the Board's deliberations).

75. According to the Registration Statement, two members of the Progress Board spoke informally with members of Duke Energy's board over the following two weeks to confirm their "common viewpoint on strategic aspects of the proposed merger." (Defendants must disclose the identity of the two Progress Board members and the nature of the "informal discussions," including the "common viewpoint on strategic aspects" discussed).

76. Yet again, on September 26, 2010, defendant Johnson and Mr. Rogers met to discuss "a range of topics," including "*how best to organize* management" of a combined company. (emphasis added) (Defendants must disclose the "range of topics" discussed).

77. Now months into negotiations with Duke, the focus was still mainly on Board and executive positions, as opposed to negotiating a deal-price that would be best for shareholders, without any consideration of whether to engage other potential bidders in a competitive sales process to try and get a better deal for Progress' shareholders.

78. Progress' Corporate Governance Committee held a meeting with Hutton on October 1, 2010 "to discuss the transaction" -- the nature of such discussions and the conclusions reached were not, but should be disclosed.

79. On October 2, 2010, Mr. Rogers presented defendant Johnson with an illustrative outline, providing for an even lower price/exchange ratio than the one previously offered of 2.5 to 2.55, and suggesting that the combined board be comprised of ten designees from Duke and five from Progress. In addition, the outline reflected that Mr. Rogers would serve as the executive chairman and defendant Johnson would serve as the chief executive officer of the combined company. The heightened focus on negotiations concerning executive and board positions is telling as to the Defendants' true priorities in this transaction, which were clearly not with respect to Progress' shareholders. (Defendants must disclose the reasons Duke made a lower offer).

80. Mulhern and Good, together with representatives of Lazard and J.P. Morgan, met on October 12, 2010 to discuss the parties' positions on an appropriate exchange ratio. Mr. Mulhern communicated Progress' Energy's "reasons" for its view that the exchange ratio should be in the 2.6 to 2.65 range and that, based on Progress' review and the financial projections prepared by Progress and Duke, a combination could be accretive on an earnings per share basis to Duke within that range. Ms. Good reviewed the "reasons" for Duke's view that the exchange ratio should be in the range of 2.5 to 2.6, including Duke's belief that it would be substantially accretive to the *adjusted* earnings of Progress' shareholders in that range. (Defendants must disclose the "reasons" for the parties' views supporting their respective proposed exchange ratios and how a combination of the companies would be "accretive" to both sets of shareholders and what is meant by "adjusted earnings").

81. On October 22, 2010, Progress and Duke met separately with Booz to discuss Booz's "preliminary views on potential efficiencies and to discuss state regulatory approval matters." The Parties' legal counsel, Mr. McArthur (Progress) and Mr. Manly (Duke) also met

*"to discuss employment matters.* (The Registration Statement must disclose Booz's preliminary views on potential efficiencies and regulatory approval matters, as well as the nature of the employment matters discussed in order for Progress' shareholders to make a fully informed determination of potential conflicts possessed by the Company's management and Board, as well as whether a merger is more beneficial to Progress shareholders than other strategic alternatives).

82.     The Progress Board held a special meeting on November 22, 2010, with Lazard and Hutton in attendance. During the November 22 meeting, "Mr. Mulhern reviewed the challenges and opportunities of Progress' current standalone plan." Those "challenges and opportunities," which were not disclosed to shareholders, must be disclosed in order for Progress' shareholders to make an informed vote on whether Progress would be more profitable as a standalone company. Defendants should also disclose the nature of the discussions regarding "certain claims against Duke Energy arising from the Cresecent Resources bankruptcy and matters relating to Duke Edwardsport Indiana Plant and Duke Energy Ohio's Security Plan."

83.     On December 5, 2010, defendant Johnson and Rogers met again to "continue[] their discussion on organizational structure for the combined company and the allocation of duties and responsibilities between the executive chairmen and chief executive officer" (again, focusing on their own positions). During the December 5 meeting, defendant Johnson "reiterated the Progress board of director's expectation that the exchange ratio would be in the 2.6 to 2.65 range," while Mr. Rogers "reaffirmed [Duke's] view that the exchange ratio should be in the 2.5 to 2.6 range." (Material facts concerning how the respective parties determined the exchange ratio ranges, and any undisclosed discussions, and what information they relied upon must be disclosed in order to fully inform Progress' shareholders and allow them to make a fully informed decision regarding the proposed price and the credibility of the process).

Case 5:11-cv-00397-D   Document 1   Filed 07/18/11   Page 26 of 59

84.     After several meetings throughout December 2010 to discuss, amongst other things, board positions, and executive compensation matters, on December 18, 2010, defendant Johnson and Mr. Rogers met and discussed a revised illustrative outline "that reflected, among other things, an exchange ratio between 2.6 and 2.625, [and] *a pro forma board composed of ten Duke Energy designees and seven Progress Energy designees, and Duke Energy designees chairing four of the combined company's six board committees.*" The "outline also reflected that Progress Energy executives who would be executives in the combined company would waive certain change of control triggers in their employment arraignments," something not evidently required of Defendant Johnson, who essentially negotiated the deal.

85.     Throughout December 2010 and early January 2011, the parties continued to negotiate the terms of the Merger Agreement. On December 22, 2010, representatives of Hutton and Wachtell "discussed the merger agreement revisions that [Hutton] had previously transmitted to Wachtell Lipton: and "[r]epresentatives . . . continued to negotiate the terms of the merger agreement through January 7, 2011." (The "revisions" are not, but should be disclosed).

86.     On December 23, 2010, Mr. Manly, Duke's legal counsel, provided Mr. McArthur, Progress' legal counsel, "a term sheet proposing the material terms for Mr. Johnson's post-closing employment by Duke Energy, reflecting the views of the compensation committee of the Duke Energy board of directors discussed at its December 8, 2010 meeting." (those views are not disclosed and must be). Defendant Johnson executed the term sheet providing him with windfall financial benefits and a prestigious CEO position at the combined company on January 8, 2011, the day the Merger Agreement was signed.

87.     Progress, suddenly, and with no mention of a process, engaged Barclays Capital Inc. ("Barclays") in late December 2010 to render a "fairness opinion," despite Barclays'

27

significant conflicts of interest resulting from the services it provided to Duke on billions of dollars of deals, and the fact that it had done much more work for Duke than it had for Progress. The deals Barclays worked for Duke on in the past dwarfs those of Progress. Considering that Barclays had a major relationship with Duke, a pittance compared to Progress, and considering the relatively small size of its fees in this deal for Barclay in comparison to its overall relationship with Duke, the potential for conflict is huge. Thus, the process employed to select Barclays, the reasons Barclays was chosen to render a fairness opinion, as well as the nature of the services Barclays provided to both Progress and Duke in the past and the compensation received for such past services are not, but must be disclosed to Progress' shareholders in order for them to assess the credibility of Barclays, financial analyses. (For similar reasons, the past compensation received by all the bankers in the deal must be disclosed, so that the shareholders can be assured that there are no significant conflicts between the overall business relationships between the banks and the parties, and the smaller fees they stand to receive in this deal in relation of the overall business relationship with the parties).

88.    On December 30, 2010, Defendant Johnson and Mr. Rogers spoke again to discuss proposed terms of a merger. Mr. Rogers "indicated that Duke Energy was anticipating structuring its proposal to include an exchange ratio yielding approximately a 5% premium for Progress Energy shareholders and an 11-7 split of seats on the combined company board of directors. Mr. Johnson responded that the proposed percentage premium indicated an exchange ratio, based on current trading prices, below the range specified by the Progress Energy board of directors . . . [and] the proposal would therefore likely not be acceptable to Progress Energy's board of directors but that he would report it to the Progress Energy corporate governance committee." (The exchange ratio proposed by Mr. Rogers is not, but must be disclosed in order

for shareholders to meaningfully assess the proposed considerations and the credibility of the Board's process. In addition, Defendants must disclose the basis for defendant Johnson's statement that the proposed consideration would be unacceptable to the Board).

89.     Defendant Johnson and Mr. Rogers spoke again on January 2, 2011 during which Rogers indicated that Duke would be prepared to agree on a board composition of eleven Duke designees and seven Progress designees, with an exchange ratio of 2.6. Progress responded to Rogers on January 4, 2011 and "emphasized that Duke would need to offer an exchange ratio within Progress Energy's previously described range." (Defendants must disclose the basis for Johnson's counter proposal).

90.     Duke's board of directors met on January 5, 2011 to discuss Progress' request for "an exchange ratio above 2.6, within Progress Energy's previously described range." J.P. Morgan and Bank of America, Duke's advisors, "each discussed with the board financial aspects of the proposed transaction, assuming a range of potential exchange ratios, including financial overviews of the two companies and the combined company." (The assumed ranges must be disclosed, along with the financial overviews).

91.     On January 6, 2011, the media began reporting on a possible transaction between Progress and Duke. The next day, Progress' Board met with representatives of Lazard, Barclays, and Hutton to discuss the Proposed Transaction. During the January 7 meeting, the Board discussed defendant Johnson's "severance package." Representatives of Lazard and Barclays also informed the Board that they would be prepared to deliver to the Board *the very next day* their respective opinions that an expected exchange ratio of 2.6 or higher in the merger was fair, form a financial point of view, to Progress shareholders. That same day, Mr. Rogers contacted

Defendant Johnson and said Duke was willing to offer an exchange ratio of 2.6125 and an 11-7 board split. Defendant Johnson said he would recommend the transaction to the Board.

92. On January 7, 2011, Rogers advised Duke's board that he received a letter from Company A stating Company A was "in a position to offer Duke Energy a premium of 10%-15%." Rogers also informed the Duke board of his previous agreement with defendant Johnson. After quickly reaching a conclusion to reject Company A's offer, the Duke board voted to approve the transaction with Progress on the terms discussed between Johnson and Mr. Rogers the day before. (The Registration Statement should disclose the basis for Duke's conclusion to reject Company A's offer).

93. Progress' Board held a meeting on January 8, 2011, at which "Mr. Johnson also read an email that he had received that morning from Company A, expressing Company A's *strong interest* in discussing a combination between Progress Energy and Company A and Company A's belief *that Company A could offer consideration constituting a 12%-15% premium for Progress Energy shareholders*." (emphasis added). Without obtaining the advice of Booz or others, the Board summarily dismissed Company A's superior offer a second time, in favor of a lower offer from Duke. Moreover, the Board unreasonably and disloyally favored a transaction with Duke, instead of using Company A's significantly higher premium to create a competitive bidding process with Duke to maximize shareholder value. Instead, in breach of its fiduciary duties, the Board rejected Company A's offer outright on the same dubious grounds as before, with the additional excuse that it was now "too late" to consider Company A's offer. Pursuant to the terms of the Merger Agreement, however, Progress is required to consider competing offers that may be considered a "superior" proposal. The Board breached this fiduciary duty by failing to consider Company A's offer.

94. At the January 8 meeting, the Progress Board also dismissed an inquiry from Company C, a non-U.S. energy company, because it "contained no substantive terms" and was likely to "encounter significant regulatory obstacles." In breach of its fiduciary duties, the Board did not consider what could be a superior offer from Company C or use Company's C's overture to create a competitive bidding war. Moreover, since Johnson hid the fact that the Company was for sale and did not engage the Company in any sort of auction process, Company C could not have indicated its interest until news about the merger reached the market. Nevertheless, the Individual Defendants put their own interests ahead of the Company's shareholders, focusing on employment positions with what will be North Carolina's "pride and joy," the largest energy company, to the detriment of the Company's shareholders.

95. The Progress Board approved the Proposed Transaction for inadequate consideration, which equated to approximately $46.48 per share, or *a tiny premium of 3.9%* based upon Duke's closing share price on January 7, 2011, the last trading day before the Board approved the Merger Agreement.

### 2. The Inadequate Price Offer Price Undervalues The Company

96. The Proposed Transaction consideration is inadequate. First, the Proposed Transaction value of $46.48 per share represents a paltry premium of just 3.9% based on the $44.72 closing price of Duke stock the day prior to the announcement of the Proposed Transaction. The 3.9% premium Duke is paying for Progress is less than the 17% average premium paid for U.S. electric utilities during the last two years, according to data compiled by Bloomberg. David Grumhaus, a partner and utilities expert at the Chicago hedge fund Copia Capital told Bloomberg News: "I don't like this deal at all if I'm Progress. It's hard to see how

they couldn't have held out for a bigger premium." He also told the publication *Trading Markets* that "people are really questioning what [this deal] really does for Progress."

97. In addition, the Proposed Transaction consideration fails to adequately account for the significant synergies created by the merger that will be realized mainly by Duke and its shareholders. The merger is anticipated to be accretive to Duke's adjusted earnings in the first year after closing. According to Marc de Croisset, an analyst at FBR Capital Markets, "Duke on a stand-alone basis, while deploying significant capital investment . . . was pretty much running to a standstill. One of the reasons this deal was consummated was to improve earnings growth for Duke."

98. Following completion of the Proposed Transaction, Duke shareholders will own approximately 63 percent of the combined company and Progress shareholders will own approximately 37 percent of the combined company on a fully diluted basis. However, Progress is contributing 3.1 million customers, or 43%, to the combined company while Duke is contributing 4 million customers, or 57%. In addition, Progress is contributing 22,000 megawatts of power generation capacity, or 38.6%, to the combined company, while Duke is contributing 61.4%. Accordingly, the ownership interest of Progress' shareholders in the combined company is inadequate and does not sufficiently compensate the Company's shareholders.

99. Furthermore, Wall Street analysts, including JP Morgan, issued a price target for Progress of $47.00 per share before the Proposed Transaction was announced, representing a significant premium over Duke's switch offer price. *The Wall Street Journal* reported on January 9, 2011 that "Duke is paying a low premium to Progress' shares" and that the purported benefits from the transaction "are hazy."

100. Accordingly, Duke is acquiring control of Progress at a small premium, and at the most opportune time, when Progress is trading at a huge discount to its intrinsic value.

101. The day before the Individual Defendants signed the Merger Agreement, Dominion Resources Inc. ("Dominion"), presumably Company A, offered to pay as much as a 15% premium to acquire Progress -- four times what Duke has agreed to pay in the Proposed Transaction. The Board, however, did not adequately consider Dominion's proposal and went ahead with a preclusive and coercive Merger Agreement just one day later. As reported by Bloomberg, "Dominion Resources Inc., the Richmond, Virginia-based utility, made takeover overtures last week to . . . Progress in a last-ditch effort to prevent them from agreeing to merge," and "Dominion offered as much as a 15% market premium . . ."

102. As demonstrated above, the Board failed to secure a fair price for the Company, either for the intrinsic value of its assets or the value of the Company's assets to Duke that would maximize shareholder value, to the detriment of Progress' shareholders.

## C.    The Banker's Conflicts of Interest

103. As discussed herein, Progress hired Barclays quite suddenly in late December 2010, and provides no reasons as to why it chose Barclays, what other banks it considered, whether there was a process used to select banks to provide a fairness opinion, or whether Barclays was examined as to potential conflicts of interest, given that it had worked on billions of dollars of deals for Duke previously, all of which pale in comparison to this particular deal or past services provided to Progress.

104. According to the Registration Statement, Barclays has provided more banking services to Duke than to Progress, including work on billions of dollars of bond offerings. The amount of compensation Barclays received for services it provided to Duke must be disclosed in

order for shareholders to assess the credibility of its purported opinions. Moreover, Progress' decision to choose Barclays to render a fairness opinion raises grave questions as to the integrity of the entire process leading up to and including the Proposed Transaction given the clear conflicts Barclays has as a result of its lucrative business relationship with Duke.

105.　Additionally, an unidentified member of Progress Board was an employee of J.P. Morgan, one of Duke's financial advisors in the Proposed Transaction. J.P. Morgan seems to have initiated and partook extensively in the negotiations with Progress. This Board member's identity is not disclosed, nor is his or her role with respect to this transaction or whether any procedures were put in place to deal with the potential conflict of interest. These material facts must be disclosed in order to provide shareholders with all necessary information to determine the weight to give the process and the Board's deliberations. In any case, this presents another example of the inadequate process and complete failure of Progress to conduct a fair negotiation process for the sake of its shareholders.

### D.　The Preclusive Deal Protection Devices

106.　As part of the Merger Agreement, Defendants agreed to onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

107.　By way of example, §4.03(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Duke. This section also demands that the Company terminate any and all prior or on-going discussions with other potential acquirors.

108. In addition, pursuant to §4.3 of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify Duke of the bidder's identity and the terms of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Duke in order to enter into the competing proposal, it must grant Duke five business days notice, during which time Duke is allowed to amend the terms of the Merger Agreement to make a counter-offer so that the competing bid no longer remains a superior proposal. In other words, the Merger Agreement gives Duke access to any rival bidder's information and allows Duke a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse because the Merger Agreement unfairly assures that any "auction" will favor Duke and piggy-back upon the due diligence of the foreclosed second bidder.

109. Furthermore, the Merger Agreement unlawfully restricts the Board from obtaining a superior offer by specifying the minimum size of any takeover proposal that the Board can even look at, and by disallowing the Board from negotiating with a bidder or providing it with data unless the Board somehow first determines—before negotiations—that the Bidder will purchase at least 50% of Progress. Nor can the Board communicate with an alternative bidder unless it proposes to acquire 20% or more of Progress.

110. In addition, the Merger Agreement provides that Progress must pay a termination fee of $400 million to Duke if Progress decides to pursue a competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to submit a superior offer that is effective for one full year. The Merger Agreement effectively precludes the Board from further pursuing better offers.

111. Dominion made an offer one day before the Merger Agreement was signed that was approximately four times Duke's offer, and the Merger Agreement precludes not only the effective pursuit of that bidder, but any other bidder willing to pay more than the tiny 3.9% premium Duke offered for the Company.

112. The Board must submit the Proposed Transaction for shareholder vote even if it withdraws or modifies its approval or recommendation of the Proposed Transaction. If the Board concludes that its failure to modify or withdraw its approval of the Merger Agreement violates its fiduciary obligations to the Company and its shareholders, it still must call a shareholder meeting for approval of the Proposed Transaction under the Merger Agreement.

113. Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

114. An unwaivable majority of the minority voting requirement should be required to alleviate some of the concerns regarding lock-ups.

**E.** **Progress' Executives Officers and Directors Stand to Receive Unique Material Financial Benefits in the Proposed Transaction Not Available to the Company's Public Shareholders**

115. Certain of the Individual Defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of Progress' shareholders. Specifically, Defendant Johnson, the Company's Chairman, President and Chief Executive Officer, while negotiating the merger with Duke, was also negotiating lucrative and preferential terms of

employment for himself and Board members to the detriment of the Progress' shareholders, who will only receive a scant 3.9% premium.

116.    In this regard, Defendant Johnson will become President and Chief Executive Officer of Duke following the completion of the Proposed Transaction. Furthermore, according to a Form 8-K filed with the SEC, Defendant Johnson entered into a term sheet with Duke, which entitles him "to severance equal to the benefits provided under the Progress, Inc. Management Change-in-Control Plan." In sum, Johnson is eligible to receive a potential windfall from "severance" compensation of $22 million, while also receiving the benefits that will invariably come with the prestigious position of CEO of a now larger new Duke.

117.    In addition, the Merger Agreement provides that, upon completion of the Proposed Transaction, Duke will have an eighteen member board of directors and allows the Progress Board to nominate seven, of its current members, or one half of the Board to the new board. According to the Recommendation Statement, defendants Johnson, Baker, DeLoach, Hyler, McKee, Saladrigas and Stone will become members of the board of the new Duke.

118.    In addition, several members of Progress' conflicted executive management team will continue employment at the new Duke. Specifically, in addition to Johnson serving as CEO of the new Duke, the following employees will continue on as executives with the new Duke:

- Jeffrey J. Lyash, currently executive vice president of energy supply of Progress, will lead energy supply;

- John R. McArthur, currently executive vice president, general counsel and corporate secretary of Progress, will lead regulated utilities;

- Mark F. Mulhern, currently senior vice president and chief financial officer of Progress, will be chief administrative officer; and

- Lloyd M. Yates, currently president and chief executive officer of Progress Energy Carolinas, will lead customer operations.

119.     Johnson and the Board summarily rejected an offer from Dominion that provided a 15% premium for the Company just one day before signing the Merger Agreement and, instead, disloyally favored a transaction with Duke in order to obtain the prestigious employment positions and lucrative financial benefits they negotiated simultaneously with the merger with Duke, as discussed above.

120.     Based on the aforementioned, the Proposed Transaction is wrongful, unfair and harmful to Progress, and represents an effort by Defendants to aggrandize their own financial position and interests, accepting a paltry bid with a friendly company at the expense of, and to the detriment of, Progress.

121.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company will continue to suffer absent judicial intervention.

F.     **The Materially Misleading And Incomplete Registration Statement**

122.     On March 17, 2011, the Company filed the Registration Statement with the SEC in connection with the Proposed Transaction. In addition to the material misstatements and omissions concerning the process and financial advisors' conflicts of interests described in Section V.B., *supra*, the Registration Statement also fails to provide the Company's shareholders with material information regarding Progress' and Duke's financial analyses supporting their fairness opinions, thereby rendering the shareholders unable to make an informed decision on whether to cast their votes for or against the merger concerning.

123.     With respect to the financial projections relied upon by Progress' and Duke's financial advisors, the Registration Statement fails to disclose the projections and forecasts of Progress and Duke that were used in the various financial analyses. In particular, the Registration Statement fails to, but should, disclose:

(a)     The "synergy forecasts" prepared by Progress and Duke;

(b)     The "unlevered" free cash flow figures provided in Duke's as well as Progress' projections;

(c)     The principal and interest associated with the securitized debt referenced in the Bank of America Merrill Lynch report;

(d)     the financial projections for the various business segments of Progress and Duke that were the basis of the bankers "sum of the parts" analysis";

(e)     The "funds from operations" as used by Lazard and referenced on pg. 91 of the Registration Statement

(f)     The "assumptions about required cash contributions to the Progress defined benefit plan when preparing the Progress management case" used by Progress management;

(g)     "Duke Energy management's assumptions about such required cash contributions" that were used by Duke in adjusting Progress' forecasts;

(h)     The forecasts for Progress relating to "certain synthetic fuels tax credits" prepared by Progress' management; and

(i)     The estimated amount and timing of the cost savings and related expenses and financial efficiencies expected to result from the merger," that were prepared by Duke and Progress.

124.    In addition, with respect to all the bankers' analysis, and as to each method of analysis, the bases of their selected discount rates as well as costs of capital and equity should be disclosed, including the: (1) beta coefficient; (2) equity risk premium; (3) capital structure; (4)

cost of debt; (5) Company specific risk premium; and (6) any other variables that were used to calculate the discount rates.

125.    The Registration Statement should also disclose for each banker analysis the selection criteria used to determine the growth rates of Progress and Duke.

126.    The material disclosures deficiencies for each banker analysis are discussed below in turn.

## 1.    Financial Analyses of Lazard Frères & Co. LLC

127.    The Registration Statement fails to disclose material facts concerning the underlying methodologies, key inputs and multiples relied upon and observed by Lazard, one of Progress' financial advisors, so that shareholders can properly assess the credibility of the various analyses performed by Lazard and relied upon by the Board in recommending the Proposed Transaction. The Registration Statement also fails to provide the share valuations in dollar terms, and should provide so shareholders can assess the actual price value of their shares.

128.    With respect to the forecasts reviewed by Lazard, the Registration Statement states that "Lazard reviewed various financial forecasts and other data provided to Lazard, or approved for Lazard's use, by Progress relating to the business of Duke Energy," but fails to disclose who prepared them, who "approved" them, and what these projections were.

129.    With respect to the Selected Comparable Company Trading Analysis, the Registration Statement should disclose (a) the criteria used to select the companies used in the analysis; (b) the multiples observed for each company in the analysis; and (c) the implied value range for shares of Progress common stock and an implied value range for shares of Duke common stock that were used to calculate the exchange ratio reference ranges calculated in the analysis. The Registration Statement should provide the context as to how the comparable companies were chosen, as well as either the observed means and medians and high-low range

for those companies or the observed ranges in regard to its "selected [] reference range, and disclose the ranges of the selected companies. Finally, the Registration Statement should provide a share price range.

130. With respect to the Consolidated Discounted Cash Flow Analysis, the Registration Statement fails to, but should, disclose (a) the free cash flow projections for years 2011 through 2014 for each of Duke and Progress that was calculated by Lazard; (b) the calculations made by Lazard to derive Duke's and Progress' free cash flows, including projections of all line items necessary to calculate the companies' free cash flows; (c) the key inputs used to calculate each companies' weighed average cost of capital that was used to select the discount rate ranges used in the analysis; (d) the implied per share equity range for Duke and Progress calculated in the analysis; and (e) the amount of "increased cash flows assumed to result from certain strategic initiatives" that were used in the analysis..

131. With respect to the Sum-of-the-Parts Discounted Cash Flow Analysis of Progress, the Registration Statement fails to, but should, disclose (a) the "selected public companies Lazard viewed as reasonably comparable to each segment" that were observed in selecting the discount rate ranges used for the Florida and Carolinas segments, and what criteria from these companies were observed in selecting the discount rate ranges; (b) the "amortized projected income tax credits associated" with the Synfuels segment; (c) why "to value Synfuels, Lazard performed a four year discounted cash flow analysis of the amortized projected income tax credits" when Barclays did a six year analysis (is that when the credits end?); (d) the projected cash flows for each segment identified in Lazard's sum of the parts analysis. With respect to the Sum-of-the-Parts Discounted Cash Flow Analysis of Duke, the Registration Statement fails to, but should, disclose the "selected public companies Lazard viewed as reasonably comparable to

each segment" that were observed on selecting the discount rate ranges and exit multiples for each segment, and what criteria from these companies were observed in selecting the discount rate ranges and exit multiples. Furthermore, the Registration Statement should disclose the basis of its judgment as to the "estimated range of weighted average cost of capital, based in part on analyses of selected public companies . . . comparable to each segment," and should, after identifying the companies and the reasons for their selection, explain why different discount rates and multiples were applied to the various segments.

132. The Registration Statement should also disclose the amount of accretion to Progress' shareholders that was observed for years 2012, 2013, 2014, and to the 20-day VWAP of shares of Progress common stock in the Pro Forma Shareholder Value Accretion Analysis.

133. With regards to the Dividend Discount Analysis, the Registration Statement fails to disclose (a) the "cost of equity capital for the Progress comparable companies" that were observed in selecting the discount rate range of 8.00% to 9.00%; (b) the "cost of equity capital for the Duke Energy comparable companies" that were observed in selecting its discount rate range; and (c) the "implied value range for shares of Progress common stock and an implied value range for shares of Duke common stock" calculated in the analysis.

134. With regard to Equity Research Analyst Price Targets, the Registration Statement should disclose the range of high and lows of Progress' and Duke's target prices. The Registration Statement should also disclose the high and low share prices of Duke and Progress after "Lazard adjusted each price target to give effect to . . . quarterly dividends, and discounted the adjusted price target (net of expected dividends) to the present value at a cost of equity of 8.5%," as well as how "Lazard adjusted each price target to give effect to interim Duke quarterly dividends."

135.    The Registration Statement should disclose why no precedent transaction analysis was conducted given that precedent transaction analysis is eminently appropriate here, and reflects the actual premiums shareholders could reasonably expect from such change of control transactions--and even more notably, given that the average premium shareholders received in this industry were much higher than Progress shareholders are to receive in the Proposed Transaction.

136.    The Registration Statement should disclose the fees received by Lazard for the compensation Lazard received for services it provided to Duke or Duke affiliated companies, and any fees it received in connection with prior business for Progress, so that shareholders can assess the scope of any potential conflicts.

### 2.    Financial Analyses of Barclays Capital Inc.

137.    The Registration Statement fails to disclose material facts concerning the underlying methodologies, key inputs and multiples relied upon and observed by Barclays Capital, one of the Company's financial advisors, so that shareholders can properly assess the credibility of the various analyses performed by Barclays and relied upon by the Board in recommending the Proposed Transaction. It also fails to disclose whether the financial and operating information with respect to Duke and Progress were the same as those used by the other firms.

138.    With respect to the *Selected Comparable Company Analysis,* the Registration Statement fails to, but should, disclose (a) the criteria used to select the companies used in the analysis; especially given that the companies it chose are different than other banks (b) the multiples observed for each company in the analysis; (c) the "range of implied equity values per share of Progress common stock and per share of Duke Energy common stock" calculated in the

analysis which were used to calculate a range of implied exchange ratios; (d) the observed multiples of the comparable companies, the observed ranges, and the median and mean ranges. For the benefit of shareholders, it should also additionally disclose the ranges in dollar terms.

139. With regards to the *Pro Forma Merger Analysis*, the Registration Statement fails to disclose the nature and amount of the "increase in EPS and DPS of Progress when compared to the Progress Projections on a stand-alone basis in the years 2012 through 2014 and when compared to Progress' I/B/E/S EPS and DPS estimates on a stand-alone basis in the years 2012 through 2014" observed in the analysis; (b) the nature and amount of the "increase in the EPS of Duke Energy when compared to the Duke Energy Projections on a stand-alone basis in the years 2012 through 2014 and when compared to Duke Energy's I/B/E/S EPS estimated on a stand-alone basis in the years 2012 through 2014" observed in the analysis; (c) whether potential "business cost benefits" refers to synergy or something else; (d) why it assumes "Progress would reverse the annual $300 million share issuances" when that is in the projections given by Progress; and (e) the basis and significance of its assumption of "incremental pension funding of $ 325 million from 2012 through 2015."

140. With respect to the *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose (a) the free cash flow projections for years 2011 through 2014 for Progress and Duke Energy calculated in the analysis; (b) the "federal tax credits granted to Progress Energy under Section 45K of the Code for the fiscal years 2011 through 2016" used in the analysis, and why it is used through 2016 when Lazard's ends it at 2014; (c) the comparable companies observed and key inputs used to calculate the 5.86% to 6.86% and 6.01% to 7.01% discount rate range used for Progress and Duke Energy respectively; and (d) range of implied equity values per share calculated for Progress and Duke Energy in the analysis.

141.     With respect to the *Sum-of-the-Parts Analysis,* the Registration Statement fails to, but should, disclose (a) the comparable companies and metrics of the comparable companies that were used in selecting the various discount rates and terminal multiples used in the analysis; (b) the enterprise values for each of the segments of Duke Energy and Progress calculated in the analysis (c) the "comparable sets of gas and liquid distribution companies, independent power companies, Latin American Power companies and renewable energy companies." (d) what "the various multiples" were that were applied to "selected financial measures of the corporate segments" of Progress and; (e) why no discounted cash flow analysis was used for "Corporate" when it was used for "Regulated Entities" and "Tax Credits."(f) The basis of the 7.7x to 8.7 EBITDA range for "Corporate;" (g) with respect to Tax Credits why the analysis is conducted through 2016, and whether 2016 is when the credits run out.  With respect to Duke, the Registration statement should disclose, identify, and explain the significance of the "selected Gas LDC Companies.   It should also disclose its basis for "the selected set of comparable independent power producer companies," and how they were selected, as well as the "comparable renewable energy companies."

142.     With regard to the Implied Exchange Ratio section, the Registration Statement should disclose the price targets in the Research Price Targets Analysis, as well as the ranges.

143.     The Registration Statement should disclose why no precedent transaction analysis was conducted given that precedent transaction analysis is eminently appropriate here, and reflects the actual premiums shareholders could reasonably expect from such change of control transactions--and even more notably, given that the average premium shareholders received in this industry were much higher than Progress shareholders are to receive in the Proposed Transaction.

144. The Registration Statement should disclose the amounts of the prior fees received by Barclays for each of the services it provided to Duke and Progress. It should also explain why, and pursuant to what process, Barclays was chosen to give a fairness opinion for Progress when Barclays has provided services for billions of dollars of Duke business deals, and has worked with Duke more than to Progress.

### 3. Financial Analyses of J.P. Morgan Securities LLC

145. With respect to the financial analyses conducted by J.P. Morgan, one of Duke's financial advisors, the Registration Statement fails to, but should, disclose: the criteria used to select the companies that were used in the *Progress and Duke Energy Trading Multiples Analyses*; the multiples observed for each company in the analysis; and the multiple ranges that were applied to both Duke and Energy to calculate their implied per share value equity range in the analysis, as well as the criteria used to select such multiple ranges.

146. The Registration Statement should disclose the free cash flow projections for years 2011 through 2015 for each of Duke and Progress that was calculated by J.P. Morgan in the *Progress and Duke Energy Discounted Cash Flow Analyses*; the calculations made by J.P. Morgan to derive Duke's and Progress' free cash flows, including projections of all line items necessary to calculate the companies' free cash flows; the criteria used to select the terminal growth rates of 2.0% to 2.5% used in the analysis; and the criteria used to select the discount rate range of 5.25% to 5.75% used in the analysis.

147. The Registration Statement should disclose the "standalone value for Duke Energy utilizing the midpoint of the equity value reference range" used in the *Potential Pro Forma Value Creation* analysis; the midpoint of the equity value reference range implied from the discounted cash flow analysis of Progress that was used in the *Potential Pro Forma Value*

*Creation* analysis; and the "midpoint of the net present value reference range (as of December 31, 2010) of potential efficiencies expected to result from the merger, net of transaction fees and expenses estimated by Duke Energy's management" that was used in the analysis.

148. As to the *Precedent Transactions Analysis* conducted by J.P. Morgan (the only precedent transaction analysis that was even conducted by any of the four banks) the Registration Statement should disclose: (a) the number of transactions used; (b) the names of the companies and how they were selected; (c) the announcement or effective date of each transaction selected; (d) the multiples observed in each transaction; (e) the range of multiples applied to Duke and Progress; (f) the premiums observed in each transaction; (g) the observed applied premiums; and (h) the "selected range of such premiums." As this is the only precedent transaction analysis that was conducted, such information is vitally important for Progress' shareholders in order for them to make an informed decision as to the how to cast their votes, particularly given that premiums paid in deals in the utility industry have averaged 17% in the past two years, which is significantly higher than the premium being offered to Progress' shareholders.

149. The Registration Statement should disclose the amount of compensation it received as to each of the services it performed for Duke and its affiliates listed on page 68 of the Registration Statement, so that shareholders can assess the magnitude of the fees in this transaction relative to the fees earned in the overall relationship between J.P. Morgan and Duke. Furthermore, the Registration Statement should not merely state that "one of J.P. Morgan's employees is a member of the board of directors of Progress," but should disclose that person's name, role in the Proposed Transaction, and whether any measures were put in place to prevent conflicts of interest.

#### 4. **Financial Analyses of BofA Merrill Lynch**

150. With respect to the financial analyses conducted by BofA Merrill Lynch, one of Duke's financial advisors, the Registration Statement fails to, but should, disclose: the "relative likelihood" of achieving the future financial results reflected in the Progress management case and the adjusted Progress management case that was discussed with the management of Duke Energy

151. The Registration Statement should disclose the criteria used to select the companies that were used in the *Selected Publicly Traded Companies Analysis* for both Duke and Progress, the names of the observed and selected companies, how they were selected (and why they are different from the other banks) the observed and selected ranges, including the mean and median and the multiples, and disclose the actual multiples from each of the other companies; the criteria used to select the multiple reference ranges that were applied to both Duke and Progress in the analysis; Progress' estimated synthetic fuel tax credits for calendar years 2011 to 2016 used in the analysis and explain its significance; why EBIDTA was "adjusted to account for principal and interest associated with securitized indebtedness," what that securitized indebtedness was, why it was deemed different than other debt, its amount, and why it was the only banker to make that reduction; explain what is meant by the "*adjusted* Progress Energy management case;" explain what is meant by "the 2011 and 2012 estimated *adjusted* EPS" in regard to Duke.

152. The Registration Statement should disclose the free cash flow projections for years 2011 through 2015 for each of Duke and Progress that was calculated by BofA Merrill Lynch in *Discounted Cash Flow Analysis*; the calculations made by BofA Merrill Lynch to derive Duke's and Progress' free cash flows, including projections of all line items necessary to

calculate the companies' free cash flows; the criteria used to select the terminal multiple ranges of 8.0x to 9.0x and 7.5x to 8.5x for Progress and Duke Energy respectively; and the criteria used to select the discount rate ranges of 5.25% to 6.00% and 5.50% to 6.25% for Progress and Duke Energy respectively.

153. The Registration Statement should disclose the EBITDA, net income, and free cash flow from operations metrics for years 2010 through 2014 for each of Duke Energy and Progress that were observed in the *Contributions Analysis*, and the "the estimated value of Progress' synthetic fuel tax credits" used in the analysis and how the net income and EBITDA amounts were adjusted to take into account the tax credits;

154. As to the Implied Exchange Ratios, the Registration Statement should disclose whether they were done with the "Securitized debt" adjustments or without the adjustments.

155. The Registration Statement should disclose the "potential synergies and cost savings" used in the *Pro Forma Accretion/Dilution Analysis* and the amount of accretion for Duke Energy for years 2012 through 2014 calculated in the analysis. It should also explain why no analysis was included for 2011

156. The Registration Statement should disclose why no precedent transaction analysis was conducted given that precedent transaction analysis is eminently appropriate here, and reflects the actual premiums shareholders could reasonably expect from such change of control transactions--and even more notably, given that the average premium shareholders received in this industry were much higher than Progress shareholders are to receive in the Proposed Transaction.

157. The Registration Statement should disclose the amounts of the prior fees received by Barclays for each of the services it provided to Duke and Progress. It should also explain

why, and pursuant to what process, Barclays was chosen to give a fairness opinion for Progress when Barclays has provided billions of dollars of services to Duke in large business deals and significantly more services than Barclays has provided to Progress in the past.

## VI. CLASS ACTION ALLEGATIONS

158. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Progress common stock and their successors in interest, except Defendants and their affiliates (the "Class").

159. This action is properly maintainable as a class action for the following reasons:

(a) The Class is so numerous that joinder of all members is impracticable. As of January 11, 2011, Progress has approximately 292.94 million shares outstanding.

(b) Questions of law and fact are common to the Class, including, *inter alia,* the following:

(i) Whether the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, and due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(ii) Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonably available under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii) Whether the Individual Defendants breached any of their other fiduciary duties to Plaintiff and the other members of the Class in

connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(iv)     Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(v)      Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

(vi)     Whether Progress and Duke Energy aided and abetted the Individual Defendants' breaches of fiduciary duty;

(vii)    Whether Progress and Duke Energy issued misleading statements and/or omitted material information in their filings with the Securities and Exchange Commission and to shareholders in connection with the Proposed Transaction; and

(viii)   Whether the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

(c)      Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)      Plaintiff's claims are typical of those of the other members of the Class.

(e)      Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of § 14(a) of the Exchange Act and SEC Regulations
### (Against All Defendants)

160.    Plaintiff repeats and realleges each and every allegation set forth herein.

161.    During the relevant time period, Defendants disseminated the misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

162.    The Registration Statement was prepared, reviewed, and/or disseminated by the Defendants. It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Transaction, among other things.

163.    In so doing, Defendants made untrue statements of material fact and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions, Defendants were aware of this information and of their duty to disclose this information in the Registration Statement.

164.    Defendants were at the very least negligent in filing the Registration Statement with these materially omitted and misleading statements.

165.    The omissions and misleading statements in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding whether to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and

accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to shareholders.

166. By reason of the foregoing, Defendants have violated Section 14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder. Because of the omitted material disclosures and the misleading statements in the Registration Statement, Plaintiff and the class are threatened with irreparable harm. Therefore, equitable injunctive relief is necessary to ensure Defendants' misconduct is corrected.

## COUNT II
### Violation of Section 20(a) of the 1934 Act
### (Against All Defendants)

167. Plaintiff repeats and realleges each and every allegation set forth herein.

168. The Individual Defendants acted as controlling persons of Progress within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Progress, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends is false and misleading.

169. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

170. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

171. Progress and Duke also had direct supervisory control over composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement. Duke and Progress, in fact, disseminated the Registration Statement and are, thus, directly responsible for materially misleading shareholders because they permitted the materially misleading Registration Statement to be published to shareholders.

172. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants, Progress and Duke were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and information that they reviewed and considered, descriptions that had input from both the directors and Progress and Duke.

173. By virtue of the foregoing, the Individual Defendants, Progress and Duke have violated Section 20(a) of the 1934 Act.

174. As set forth above, the Individual Defendants, Progress and Duke had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, the Class will be irreparably harmed.

## COUNT III
### Breach of Fiduciary Duties
### (Against All the Individual Defendants)

175.    Plaintiff repeats all previous allegations as if set forth in full herein.

176.    The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith and candor owed to Progress' shareholders, and have acted to put their personal interests ahead of the interests of Progress' shareholders and acquiesced to those actions by others.

177.    The Individual Defendants acts alleged herein, individually and as part of a common plan, unfairly deprived Progress' shareholders of the true value for the Company. Despite the Individual Defendants' fiduciary obligation to Progress shareholders to get the best price for the Company, they failed to seriously consider other potential acquirers, and favored their own interests in order to accrue benefits to themselves, by selling out to a friendly suitor at an extremely low premium of 3.9%. The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company at a grossly low valuation.

178.    The Individual Defendants have breached their fiduciary duties of loyalty, care and good faith owed to Progress' shareholders, and have engaged in self-dealing, because, among other reasons:

        (a)    they failed to take steps to maximize the value of Progress and took steps to avoid competitive bidding;

        (b)    they failed to properly value Progress; and

        (c)    they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction.

179.     As a result of the Individual Defendants' breaches of their fiduciary duties, Progress' shareholders will suffer irreparable injury in that they will not receive their fair portion of the value of its assets.

180.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Progress' shareholders and may consummate the Proposed Transaction, to the irreparable harm of the Company's shareholders.

181.     There is no adequate remedy at law.

**COUNT IV**
**Aiding and Abetting**
**(Against Progress and Duke Energy)**

182.     Plaintiff repeats all previous allegations as if set forth in full herein.

183.     Defendant Progress, by reason of its status as a party to the Proposed Transaction and its possession of non-public information, has aided and abetted the Individual Defendants in the aforesaid breach of their fiduciary duties. Such breaches of fiduciary duties and violations of securities laws could not and would not have occurred but for the conduct of Defendant Progress, which aided and abetted such breaches in the sale of the Company to Duke Energy.

184.     Defendant Duke Energy, by reason of its status as a party to the Proposed Transaction and its possession of non-public information, has aided and abetted the Individual Defendants in the aforesaid breach of their fiduciary duties and violations of securities laws. Such breaches of fiduciary duties and violations of securities laws could not and would not have occurred but for the conduct of defendant Duke Energy, which therefore, aided and abetted such breaches in the sale of Progress to Duke Energy.

185. Unless the actions of Defendants Progress and Duke Energy are enjoined by the Court, Defendant Progress and Duke Energy will continue to aid and abet the Individual Defendants' breaches of their fiduciary duties.

186. As a result, Progress' shareholders are being harmed.

187. There is no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A) Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff and the undersigned counsel as class representatives;

(B) enjoining, preliminarily and permanently, the Proposed Transaction;

(C) in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D) directing that the Individual Defendants account to Plaintiff and the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E) awarding Plaintiff and the Class compensatory damages, together with pre- and post-judgment interest;

(F) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G) Awarding such other and further equitable relief as this Court deems just and proper.

Dated: July 6, 2011

_[signature]_

Robert N. Maitland II., Esq.
The Maitland Law Firm
2 Couch Road
Chapel Hill, NC 27514
(919) 265-0800
Fax: (919) 960-9554
rob@maitlandlaw.com

-and-

LEVI & KORSINSKY, LLP
Eduard Korsinsky, Esq.
Shannon Hopkins, Esq.
Allen Schwartz, Esq.
30 Broad Street, 15th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Plaintiff*